**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **KEVIN P. MURPHY, a Florida citizen,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **BERTRAND COLE AND ASSOCIATES, LTD.,** | ) |
| **d/b/a HINSDALE FINE JEWELRY** | ) |
| **COMPANY, an Illinois corporation, the** | ) |
| **ESTATE OF BERTRAND C. WAIT and JOAN** | ) |
| **WAIT, a California citizen, individually and** | ) |
| **d/b/a Precious Estate,** | ) |
| | ) |
| **Defendants.** | ) |

## COMPLAINT

Kevin P. Murphy ("Murphy"), through his attorneys, Bruce C. Scalambrino, Gregg J. Simon, and the law firm of Scalambrino & Arnoff, LLP, as his complaint against Bertrand Cole and Associates, Ltd., d/b/a Hinsdale Fine Jewelry Company ("HFJC"), an Illinois corporation, the Estate of Bertrand C. Wait ("Wait"), and Joan Wait ("Joan"), a California citizen, individually and d/b/a Precious Estate, states the following:

## PARTIES

1.      Murphy is a Florida citizen.

2.      At all times relevant hereto, HFJC was and is an Illinois corporation that had its principal place of business located in Oak Brook, DuPage County, Illinois.

3.      HFJC sold high-end jewelry online and out of its Oak Brook store.

4.      At all times relevant hereto, Wait was an Illinois citizen who resided in Naperville, DuPage County, Illinois prior to his death on March 25, 2020.

5.      At all times relevant hereto, Wait was HFJC's owner and President.

6.      At all times relevant hereto, Joan was Wait's wife, an Illinois citizen who resided in Naperville, DuPage County, Illinois until recently selling her home and moving to California.

7.      At all times relevant hereto, Joan was HFJC's Secretary and, after the death of Wait, is believed to have become its sole owner and officer.

8.      At all times relevant hereto, Joan also engaged in a business called "Precious Estate" selling items on Facebook and eBay.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) as the parties are citizens or are incorporated in and their respective principal places of business or residence are located in different states and the amount in controversy exceeds $75,000.00.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) as a substantial part of the events giving rise to the claims alleged herein occurred within this District.

## FACTUAL ALLEGATIONS

11.     Murphy owned several companies including one that sold underground water valves and another that sold motorcycles.

12.     Murphy and Wait had known each other since 2001 or 2002 and Murphy would purchase jewelry at HFJC.

13.     Wait bought a motorcycle from Murphy's company Windwalkers.

14.     Murphy and Wait became friends and would socialize individually and with their spouses. The couples traveled to Greece and England together.

15.     In August, 2018, Wait, on HFJC's behalf, approached Murphy with a business proposition concerning the purchase and sale of Chinese antiquities.

16.     In mid-August, 2018, Wait took Murphy to a Gurnee location where Chinese

2

antiquities allegedly owned by Chen & Chen Oriental Furniture, Inc. ("Chen & Chen") were stored. The Chinese antiquities had Chen & Chen tags on them. Wait told Murphy that Chen & Chen was liquidating the antiquities. Wait proposed that Murphy and HFJC could each contribute $75,000 to buy the Chinese antiquities and claimed HFJC could sell the inventory for at least $300,000 within 90 days.

17.     Wait told Murphy that HFJC and Wait would handle the sale of the antiquities.

18.     Murphy knew that Wait had worked for Tiffany and Nordstrom before opening HFJC and that Wait had worked in New York, Pennsylvania, Lake Tahoe, and Chicago.

19.     In reliance upon Wait and HFJC's experience in selling high-end jewelry, Murphy accepted HFJC's proposal.

20.     On August 31, 2018, Murphy gave Wait a check payable to HFJC in the amount of $30,100 and $45,000 in cash as Murphy's $75,000.00 contribution to their joint venture. A true and correct copy of the check #1035, dated August 31, 2018, in the amount of $30,100 is attached as Exhibit 1.

21.     HFJC, through Wait, purchased what purported to be the Chinese antiquities from Chen & Chen (the "Inventory").

22.     HFJC initially stored the Inventory at a Gurnee location.

23.     On September 17, 2018, Murphy, Wait, and a photographer, Steven Robbins ("Robbins") of Robbins Productions, Inc., went to the Gurnee location to examine the Inventory. Robbins photographed all of the Inventory at this time. To memorialize their joint venture, Wait, on behalf of HFJC, presented Murphy with two bronze statues from the Inventory.

24.     Following their visit to the Gurnee location, Wait provided Murphy with a booklet titled, "Asian Antiques – Hinsdale Fine Jewelry" with photos of many of the Inventory. Wait told

3

Murphy that the booklet was one of the means that HFJC was marketing the sale of the Inventory. A true and correct copy of the booklet is attached as Exhibit 2.

25.     The picture on the front page of the booklet was of a piece sitting on the fireplace mantle at the Wait family home located in Naperville, Illinois. Murphy recognized the piece as being from the Inventory he saw at the Gurnee location and recognized the fireplace mantle from previous visits to the Waits' home.

26.     Murphy became seriously ill while on business in London, England in October, 2018 and was hospitalized in London for 3 weeks.

27.     Murphy wound up being hospitalized, off-and-on, after his return to the United States through April, 2019.

28.     Wait and Murphy did not discuss disposing of the Inventory while Murphy was sick.

29.     In late 2018, Murphy found out Wait had been diagnosed with cancer.

30.     While Murphy was sick, Wait caused HFJC to move the Inventory to an undisclosed location in Winfield, Illinois. Wait had told Murphy the Inventory needed to be moved because the Gurnee location was rented by Chen & Chen.

31.     During this time, Wait and HFJC, without informing Murphy, removed Inventory pieces from the storage facility and either sold them, or Wait and Joan kept them, without Murphy's permission or knowledge.

32.     Certain Inventory suffered water damage and broke while in storage under Wait and HFJC's sole control.

33.     Wait told Murphy that the rent paid by HFJC for the storage of the Inventory was $3,000 per month. He said that HFJC and Murphy were each responsible for an equal portion of

4

the rent, or $1,500 per month.

34.     As Murphy was led to believe that his portion of the rent from January – May, 2019, was $7,500, he paid HFJC $7,500 on June 1, 2019. *See* a true and correct copy of check #1171, dated June 1, 2019, in the amount of $7,500 attached as Exhibit 3.

35.     Murphy believes that HFJC kept the $7,500 and did not use it to pay rent.

36.     At this time, Murphy did not know where the Inventory was stored. When Murphy asked Wait where the Inventory was located, he would not get an answer.

37.     On July 14, 2019, Wait telephoned Murphy that HFJC was selling its 50% interest in the Inventory to an undisclosed third-party for $35,000, with the entire purchase price to be paid at closing. Murphy insisted he had a right of first refusal. Murphy offered to pay HFJC $17,500 immediately and the remaining $17,500 after Murphy sold the remaining Inventory. Wait told Murphy that he would consider it and ended the call.  Within thirty minutes, Wait called Murphy back and accepted Murphy's offer.

38.     During these discussions, Wait never informed Murphy that he had removed pieces of Inventory from the storage facility and either took them for himself and Joan or had sold them.

39.     Murphy paid the initial $17,500 to HFJC on July 14, 2019. *See* a true and correct copy of check #1223, dated July 14, 2019, in the amount of $17,500 attached as Exhibit 4.

40.     After Murphy demanded access to the Inventory, Wait informed Murphy where the Inventory was stored on July 16, 2019. That same day Murphy drove Wait to the Winfield location where Wait and HFJC had stored the Inventory.

41.     Upon arrival, Murphy could see that the Inventory was covered in tarps and stacked one on top of another in a barn. The barn had holes in the ceiling and a dirt floor. As the

barn was located on a flood plain, the Inventory was stored on wooden pallets. The Inventory was piled high, and the barn was full.

42.     When Murphy subsequently attempted to gain access to the Inventory at the barn in Winfield, Brain Johnson of Liberty Conservation Club, the barn owner, told him that there was overdue rent. Murphy paid Liberty Conservation Club the claimed overdue rent of $7,500 during the last week of July, 2019. *See* true and correct copies of check #1237, undated but cashed on July 29, 2019, in the amount of $1,500, and check #1239, dated July 26, 2019, in the amount of $6,000, both payable to Liberty Conservation Club, attached as Exhibit 5.

43.     Murphy then had Robbins, from July 30, 2019 through August 2, 2019, photograph the (remaining) Inventory located in the Winfield barn. Murphy and Jon Revilla scouted the location on July 30, 2019 to estimate how many truck trips it would take to move the Inventory out of the barn.

44.     Murphy, with movers he had hired and their trucks, went to move the Inventory from the Winfield barn on August 1, 2019. Murphy was to meet Mr. Johnson in order to gain access to the barn.  During this time, Wait called Murphy and told him that Wait had advised Mr. Johnson to call the police. At that time, Liberty Conservation Club had placed a tractor in front of the barn, preventing Murphy from moving the Inventory. Mr. Johnson demanded that Murphy pay the balance of $17,500 owed to HFJC, instead of waiting until after the Inventory had been sold as had originally been agreed by HFJC.

45.     Murphy left and obtained a cashier's check, in the amount of $17,500, payable to the Liberty Conservation Club, Murphy returned to the barn the next day with the check to give to Mr. Johnson and with the movers. *See* a true and correct copy of the August 2, 2019 cashier's check #31793322 for $17,500 made payable to Liberty Conservation Club and purchased by

Murphy attached as Exhibit 6; *see also* a true and correct copy of a photo, dated August 2, 2019 at 9:48am titled "Locked out," showing Murphy discussing the matter with Mr. Johnson, attached as Exhibit 7.

46.     Murphy and the movers waited an hour for Mr. Johnson to go to the bank and cash the cashier's check. Mr. Johnson then allowed Murphy and the movers to move the Inventory. The Inventory was then moved to St. Charles.

47.     Mr. Johnson subsequently informed Murphy that he had turned over the $17,500 received that day to Wait.

48.     Robbins was interested in accepting several pieces from the Inventory in lieu of payment of his fees for photographing the same.

49.     Robbins realized from photographing the Inventory at the Winfield barn that several items were missing from the Inventory. When Robbins notified Murphy of this, Murphy had Robbins photograph the remaining Inventory stored at the St. Charles location.

50.     On Robbins' way to Chicago following photographing the Inventory in St. Charles, Robbins stopped by HFJC's Oak Brook location. There he saw and took pictures of Inventory items that were located in HFJC's store.

51.     On August 9, 2019, Robbins again photographed the Inventory at a storage facility in St. Charles Murphy rented.

52.     In mid/late August, 2019, Robbins searched online for the Chinese antiquities and found them being sold by Joan as Precious Estate on Facebook and eBay.

53.     It took Robbins several months to catalog the Inventory to determine which items were missing. After cataloging the Inventory, Robbins realized 94 Inventory items were missing and created a catalog of the missing Inventory (the "Missing Inventory"). A true and correct copy

of the Catalog of Missing Inventory Items is attached as Exhibit 8.

54.     Murphy retained Christopher Axelrod in November, 2019 to value the Missing Inventory. Axelrod reviewed the Inventory in storage and the Catalog of Missing Inventory Items on about November 5, 2019. Axelrod informed Murphy that the remaining Inventory were not the best pieces. Axelrod valued the Missing Inventory at $103,500. A true and correct copy of Axelrod's November 6, 2019 report and November 20, 2019 addendum is attached as Exhibit 9.

55.     Murphy arranged for items from the remaining Inventory to be consigned for sale.

56.     In December, 2019, Aspire Auctions, Inc. sold several items from the remaining Inventory which netted Murphy $3,676.  A true and correct copy of the Aspire Auctions, Inc. Consigner Report is attached as Exhibit 10.

57.     Wait was hospitalized with cancer and died in March, 2020.

58.     Following Wait's death, the website for HFJC has remained active at "hinsdale-fine-jewelry-co.business.site". Google shows HFJC as temporarily closed.  HFJC is not in good standing with the Illinois Secretary of State.

59.     Certain Inventory was transported to Leonard Auction, Inc. for consignment sale. Leonard Auction sold some Inventory items on May 4, 2020, totaling $563.25; May 29, 2020, totaling $545.75; June 26, 2020, totaling $3,687.50; July 31, 2020, totaling $295.00; August 28, 2020, totaling $103.25; and October 2, 2020 for $59.00. A true and correct copy of the Leonard Auction Consignment Settlements are attached as Exhibit 11.

60.     Robbins found some of the Missing Inventory for sale on Joan's Precious Estate Facebook page, which was updated on June 23 2020. Robbins also found Joan's Precious Estate selling Missing Inventory items on eBay.

61.     The remaining Inventory was sent for consignment to Relic Home Furnishings

("RHF") in Strongsville, Ohio in July, 2020.

62.     Following RHF's receipt of the remaining Inventory, Brian O'Malley from RHF searched online to find out what similar-type Chinese antiquities were selling for. He found Chinese antiquities listed on eBay under Joan's home address in Naperville, Illinois. Mr. O'Malley took several screenshots, with some items having Chen & Chen tags.

63.     From Robbins' Inventory photographs, Mr. O'Malley saw the Inventory contained a 17th century desk composed of three pieces. Mr. O'Malley valued the whole desk at $6,000. When he received the piece on consignment from Murphy, one base was missing, causing the value of the 17th century desk, in Mr. O'Malley's opinion, to plunge from $6,000 to between $200-$400.

64.     Murphy has since demanded that HFJC and Joan provide an accounting of the Inventory purchase, all Inventory sales, rent paid, and the Missing Inventory.

65.     Joan and HFJC have been unable, or unwilling, to provide Murphy with a bill of sale for the Inventory or proof of its payment of the same or that HFJC ever contributed $75,000 towards the Inventory purchase, sale, or maintenance.

66.     Joan and HFJC have also been unable, or unwilling, to provide Murphy with proof of payment of the Winfield barn rental.

67.     HFJC has been unable, or unwilling, to account for any Inventory sales before Murphy purchased HFJC's interest in the Inventory.

68.     While Joan is in possession of certain Missing Inventory pieces, HFJC and Joan have been unable, or unwilling, to account for the majority of the Missing Inventory pieces.

69.     Mr. O'Malley of RHF has since valued the Inventory that was damaged or broken while under Wait and HFJC's exclusive control or possession at $30,400. *See* a true and correct

copy of the listing detailing the broken and/or water-damaged Inventory items and the related reduction in value attached as Exhibit 12.

70.     To date, Murphy has received $8,929.75 from the sale of the Inventory.

71.     Murphy has been damaged as follows:

a.      paying $75,000 towards the purchase of the Inventory when HFJC did not pay $75,000 as agreed;

b.      paying $7,500 in alleged rent to HFJC, which was not paid to the landlord, Liberty Conservation Club, when HFJC did not pay $7,500 in rent as agreed;

c.      paying $35,000 to HFJC to acquire its 50% ownership in the Inventory and not receiving all of the Inventory;

d.      paying an additional $3,750 in alleged rent owed to the landlord, Liberty Conservation Club, which was HFJC's responsibility;

e.      paying $23,985.45 to Robbins Production to catalog the Inventory;

f.      $103,500 representing the value of the Missing Inventory;

g.      $30,400 representing the value of the water damages and broken Inventory improperly stored by HFJC and Wait; and

h.      unknown amounts representing lost proceeds for the sale of Missing Inventory sold by HFJC and/or Joan.

**COUNT I**
**BREACH OF CONTRACT**
**(against HFJC)**

72.     The allegations contained in paragraphs 1-71 are incorporated by reference as if fully written herein.

73.     Murphy and HFJC agreed to each contribute $75,000 towards the purchase of the

10

Inventory.

74.     The parties agreed that HFJC would store the Inventory and the parties would split the storage costs.

75.     The parties agreed that HFJC would sell the Inventory and the parties would equally split the proceeds on the sale of the Inventory.

76.     Murphy and HFJC agreed to split the costs of storing the Inventory.

77.     Murphy paid $75,000 towards the purchase of the Inventory.

78.     Murphy paid $11,250 in rent for the storage of the Inventory.

79.     The parties' agreement is a valid and enforceable contract between Murphy and HFJC at all times relevant hereto.

80.     HFJC materially breached the Agreement by failing to:

        a.      contribute $75,000;

        b.      provide Murphy with an equal share of any proceeds on Inventory HFJC sold or otherwise account for the Missing Inventory;

        d.      properly care for all of the Inventory so that it could be sold;

        e.      pay its share of the rent for storing the Inventory; and

        c.      prevent Wait and/or Joan from taking possession of Inventory for themselves.

81.     Murphy has performed all conditions precedent necessary to enforcement of the parties' agreement.

82.     As a direct and proximate result of HFJC's breach of the agreement, Murphy has been damaged in the amount not less than $279,135, which includes HFJC's non-payment of $75,000, $103,500 in Missing Inventory, $30,400 of water damaged and broken Inventory and

$70,235.45 in additional costs paid by Murphy, plus pre- and post-judgment interest.

WHEREFORE, Kevin Murphy requests that this Court enter judgment on its behalf against HFJC :

a.      awarding him damages in the amount not less than $270,000;

b.      pre-judgment interest;

c.      post-judgment interest pursuant to 735 ILCS §5/2-1303; and

d.      for such other and further relief this Court deems appropriate.

### COUNT II
### FRAUDULENT INDUCEMENT
### (against HFJC and the Estate of Bertrand C. Wait)

83.      The allegations contained in paragraphs 1-71 are incorporated by reference as if fully written herein.

84.      Wait and HFJC knowingly made fraudulent material representations to Murphy, including but not limited to, that HFJC would contribute $75,000 towards the purchase of the Inventory and that the parties would equally split the proceeds from the sale of the Inventory ("False Representations").

85.      Wait and HFJC never had any intention of HFJC contributing $75,000 towards the purchase of the Inventory or/and that the parties would equally split the proceeds from the sale of the Inventory.

86.      Wait made the False Representations on HFJC's behalf to induce Murphy to invest $75,000.

87.      Murphy reasonably relied on the False Representations when entering into the agreement and he would not have entered into the agreement and paid HFJC $75,000 had the False Representations not been made.

88.     Wait's misrepresentations and omissions made to Murphy on HFJC's behalf were knowingly made and were false statements of material fact.

89.     Wait's, and thus HFJC's, conduct was malicious in nature.

90.     Wait's, and thus HFJC's, conduct was done with a willful disregard for Murphy's rights.

91.     Malice is the gist of this action due to Wait's, and thus HFJC's, intentional, conscious and willful misrepresentations and omissions.

92.     Murphy has been damaged by HFJC's and Wait's fraud in the amount of $204,135, plus pre- and post-judgment interest and punitive damages.

WHEREFORE, Kevin Murphy requests that this Court enter judgment on its behalf, against HFJC and the Estate of Bertrand C. Wait, jointly and severally:

a.      awarding him damages in the amount of $190,000;

b.      pre-judgment interest;

c.      punitive damages ;

d.      post-judgment interest pursuant to 735 ILCS §5/2-1303; and

e.      for such other and further relief this Court deems appropriate.

**COUNT III**
**BREACH OF CONTRACT**
**(against HFJC)**

93.     The allegations contained in paragraphs 1-71 are incorporated by reference as if fully written herein.

94.     HFJC, through Wait, offered to sell its half interest in the Inventory to Murphy for $35,000.

95.     Wait, on HFJC's behalf, never told Murphy that the Missing Inventory would be

13

excluded from Inventory transferred to Murphy in exchange for the $35,000.

96.    Murphy paid HFJC $35,000 in exchange for HFJC's interest in the Inventory and all of the Inventory, including the Missing Inventory.

97.    The parties' agreement is a valid and enforceable contract between Murphy and HFJC at all times relevant hereto.

98.    HFJC materially breached the Agreement by failing to transfer all of the Inventory, including the Missing Inventory.

99.    Murphy has performed all conditions precedent necessary to enforcement of the parties' agreement.

100.    As a direct and proximate result of HFJC's breach of the agreement, Murphy has been damaged in the amount not less than $138,500, which includes Murphy's payment of the $35,000 and $103,500 in Missing Inventory,  plus pre- and post-judgment interest.

WHEREFORE, Kevin Murphy requests that this Court enter judgment on its behalf against  HFJC :

a.    awarding him damages in the amount not less than $130,000;

b.    pre-judgment interest;

c.    post-judgment interest pursuant to 735 ILCS §5/2-1303; and

d.    for such other and further relief this Court deems appropriate.

## COUNT IV
## FRAUDULENT INDUCEMENT
### (against HFJC and the Estate of Bertrand C. Wait)

101.    The allegations contained in paragraphs 1-71 are incorporated by reference as if fully written herein.

102.    Wait and HFJC knowingly made fraudulent material omissions to Murphy,

including but not limited to, HFJC, through Wait, never telling Murphy that the Missing Inventory would be excluded from any Inventory transferred to Murphy in exchange for the $35,000 for HFJC's half interest in the same (the "Material Omissions").

103.    Wait and HFJC never had any intention of HFJC transferring the Missing Inventory to Murphy in exchange for Murphy paying HFJC $35,000.

104.    Wait made the Material Omissions on HFJC's behalf to induce Murphy to pay $35,000 for HFJC's half interest.

105.    Murphy reasonably relied on the Material Omissions when entering into the agreement and he would not have entered into the agreement and paid HFJC $35,000 had the Material Omissions not been made.

106.    Wait's misrepresentations and omissions made to Murphy on HFJC's behalf were knowingly made and were false statements of material fact.

107.    Wait's, and thus HFJC's, conduct was malicious in nature.

108.    Wait's, and thus HFJC's, conduct was done with a willful disregard for Murphy's rights.

109.    Malice is the gist of this action due to Wait's, and thus HFJC's, intentional, conscious and willful misrepresentations and omissions.

110.    Murphy has been damaged by HFJC's and Wait's fraud in the amount not less than $138,500, plus pre- and post-judgment interest and punitive damages.

WHEREFORE, Kevin Murphy requests that this Court enter judgment on its behalf, against HFJC and the Estate of Bertrand C. Wait, jointly and severally:

a.      awarding him damages in the amount not less than $130,000;

b.      pre-judgment interest;

15

c.      punitive damages;

d.      post-judgment interest pursuant to 735 ILCS §5/2-1303; and

e.      for such other and further relief this Court deems appropriate.

**COUNT V**
**UNJUST ENRICHMENT**
**(alternatively, against HFJC)**

111.    The allegations contained in paragraphs 1-71 are incorporated by reference as if fully written herein.

112.    HFJC accepted Murphy's $75,000 and Murphy paid $11,250 in rent for the Inventory without HFJC contributing $75,000 or paying its portion of the rent for the Inventory.

113.    HFJC also retained the Missing Inventory valued at $103,500.

114.    HFJC therefore unjustly retained $189,375 to Murphy's detriment.

115.    HFJC's retention of the $189,375 violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, Kevin Murphy requests that this Court enter judgment on its behalf against HFJC:

a.      awarding him damages in the amount of $180,000;

b.      pre-judgment interest;

c.      post-judgment interest pursuant to 735 ILCS §5/2-1303; and

d.      for such other and further relief this Court deems appropriate.

**COUNT VI**
**CONVERSION**
**(against Joan Wait)**

116.    The allegations contained in paragraphs 1-71 are incorporated by reference as if fully written herein.

16

117.    HFJC and Murphy, and subsequently Murphy, had an unconditional right to possession of the Inventory, including the Missing Inventory.

118.    Joan has retained certain pieces from the Missing Inventory.

119.    Joan has wrongfully assumed control and/or dominion over certain pieces of the Missing Inventory, both before and after Murphy purchased HFJC's half interest in the Inventory.

120.    Murphy has made a demand on Joan for the Missing Inventory's return.

121.    Joan has refused to return any of the Missing Inventory to Murphy.

WHEREFORE, Kevin Murphy requests that this Court enter judgment on its behalf against Joan Wait:

a.      awarding him damages in a sum to be determined;

b.      pre-judgment interest;

c.      post-judgment interest pursuant to 735 ILCS §5/2-1303; and

d.      for such other and further relief this Court deems appropriate.

### COUNT VII
### UNJUST ENRICHMENT
### (against Joan Wait)

122.    The allegations contained in paragraphs 1-71 are incorporated by reference as if fully written herein.

123.    HFJC and Murphy, and subsequently Murphy, had an unconditional right to possession of the Inventory, including the Missing Inventory.

124.    Joan has retained and sold certain pieces from the Missing Inventory after wrongfully assuming control and/or dominion over the same, both before and after Murphy purchased HFJC's half interest in the Inventory.

125.    Joan has unjustly retained either the Missing Inventory or the proceeds from the

17

sale of the same to Murphy's detriment.

126.     HFJC's retention of the either the Missing Inventory or the proceeds from the sale of the same violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, Kevin Murphy requests that this Court enter judgment on its behalf against Joan Wait:

    a.      awarding him damages in a sum to be determined;

    b.      pre-judgment interest;

    c.      post-judgment interest pursuant to 735 ILCS §5/2-1303; and

    d.      for such other and further relief this Court deems appropriate.

**COUNT VIII**
**BREACH OF FIDUCIARY DUTY**
**(against HFJC)**

127.     The allegations contained in paragraphs 1-71 are incorporated by reference as if fully written herein.

128.     Murphy and HFJC entered into an agreement to carry on a single enterprise, that is, to sell the Inventory.

129.     Murphy and HFJC had a common interest in the enterprise.

130.     As parties in this joint venture, Murphy and HFJC had a duty to share the proceeds from the sales.

131.     HFJC breached that fiduciary duty by not contributing to the purchase and storage of the Inventory, properly caring for the Inventory while in storage, accounting for the proceeds from the sale of the Inventory, and allowing the Missing Inventory to be taken by Wait and/or Joan for their own purposes.

132.     Murphy has suffered damages due to HFJC's breach of fiduciary duty in an

amount exceeding $200,000.

WHEREFORE, Kevin Murphy requests that this Court enter judgment on its behalf against HFJC:

    a.    awarding him damages in the amount not less than $200,000;

    b.    pre-judgment interest;

    c.    post-judgment interest pursuant to 735 ILCS §5/2-1303; and

    d.    for such other and further relief this Court deems appropriate.

                                              **KEVIN MURPHY,**

                                              **By: /s/ Gregg J. Simon**
                                                  **One of his attorneys**

**Bruce C. Scalambrino (ARDC 06193809)**
**Gregg J. Simon (ARDC 06216852)**
**SCALAMBRINO & ARNOFF, LLP**
**105 West Madison Street**
**Suite 1600**
**Chicago, Illinois 60602**
**(312) 629-0545**
**Emails: bcs@sacounsel.com**
**          gjs@sacounsel.com**